# In the United States Court of Federal Claims

No. 07-210C
(Reissued: June 21, 2007)[1]

* * * * * * * * * * * * * * * * * * * * * * *
SOUTHERN FOODS, INC.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant,*

and

U.S. FOODSERVICE, INC.,

*Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * *

Post-Award Bid Protest; Jurisdiction; Tucker Act, 28 U.S.C. §1491; Motion to Dismiss for Lack of Jurisdiction; Nonappropriated Fund Instrumentalities; RCFC 52.1, Judgment on the Administrative Record.

*Cyrus E. Phillips, IV,* Washington, DC, for plaintiff.

*Joan M. Stentiford*, United States Department of Justice, Trial Attorney, Commercial Litigation Branch, Civil Division, Washington, DC, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director, for defendant.

*John J. Pavlick, Jr.*, Washington, DC, for intervenor, with whom were *Rebecca E. Pearson* and *Sharon A. Jenks*, Washington, DC, of counsel.

---

[1]This opinion was first filed on June 8, 2007. The parties proposed various redactions throughout, reflected herein by three consecutive asterisks.

## OPINION

BRUGGINK, *Judge*.

This is a post-award bid protest action for declaratory and injunctive relief brought by plaintiff Southern Foods, Inc. ("Southern Foods") against the United States, acting through the United States Army Community and Family Support Center ("USACFSC")[2]. The procurement at issue was for a food delivery contract to the U.S. Army Service Area 10. Plaintiff seeks a declaratory judgment that the USACFSC's decision to award the contract to the U.S. Foodservice ("USF" or "intervenor") was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Plaintiff further requests that we set aside the award of Contract No. NAFBA1-07-D-0022 to USF and direct the solicitation to be re-opened. USF has intervened.

The parties have filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). In addition, defendant has moved to dismiss for lack of jurisdiction. The administrative record ("AR") has been filed and the matter is fully briefed. Oral argument on the parties' motions was heard on May 10, 2007. At the oral argument, the court ordered that a new contracting officer re-evaluate the proposals and submit a new determination and findings ("D&F"). Defendant filed the new D&F as a supplement to the administrative record on May 24, 2007. The parties submitted supplemental briefs on May 31, 2007, by leave of the court. Also, pending is plaintiff's motion to further supplement the administrative record, filed on May 24, 2007, which we deny.[3]

---

[2]Subsequent to the award of the contract, USACFSC changed its name to the Family and Morale, Welfare and Recreation Command ("FMWRC"). In this opinion, we will refer to the soliciting agency as USACFSC.

[3]Plaintiff attempts to supplement the administrative record with documents comparing the pricing under Southern Foods' former contract for Service Area 10 with the pricing being used under the Army's current contract with USF. Plaintiff seeks to include this information in the record to support a contention that the price evaluation was based on incorrect information. This is a new argument, not raised prior to the remand. It is not based on post-

(continued...)

For the reasons set out below, we deny defendant's motion to dismiss, deny plaintiff's motion for judgment on the administrative record and request for a permanent injunction, and grant defendant's cross-motion for judgment.

## BACKGROUND

On February 24, 2006, USACFSC issued RFP No. NAFBA1-06-R-0016 for an Indefinite Delivery, Indefinite Quantity contract in support of the Joint Services Prime Vendor Program ("JSPV Program"). The JSPV Program is a series of contracts between various private sector vendors and the Army. Administered under the Army Non-Appropriated Fund contract and policy regulations, the JSPV Program supplies all food and food-related products to the Army Morale, Welfare, and Recreation ("MWR") activities. USACFSC provides guidance and oversight for the MWR programs. The RFP was for 18 designated Service Areas. Only Service Area 10 is relevant for this action. Service Area 10 includes Fort Knox in Louisville, Kentucky and Fort Campbell near Clarksville, Tennessee.

The RFP provided that all contracts awarded were to use nonappropriated funds only. Contracts would be for one base year with an option to extend the term of the contract for up to nine additional years. The RFP contained fourteen categories of food and food-related products. Offerors were to propose a fixed fee for each product category as either a margin or mark-up for one base year and for each of the nine option years.

The RFP required a three-volume proposal consisting of (1) a price proposal, (2) a technical proposal, and (3) a management proposal. The RFP stated that price was the "primary area of consideration" and that it was "significantly more important" than technical or management factors. AR 21. Price was to be evaluated by the contracting officer based on three subfactors, categorical individual margins or mark-up, private label rebates, and market basket, all equal in importance. The RFP stated that price would be evaluated using the fixed fee proposed by the offerors for each of the fourteen product categories. Price proposals were to be first analyzed by Mr. Chris Naumann, whose conclusions were to be validated by the contracting officer. Evaluation on the technical factor was to be based on two sub-factors, customer service and reporting, equal in weight. Evaluation of the management proposal was

---

[3](...continued)
remand information. For that reason, we deny the motion to supplement the administrative record.

to be based on two sub-factors, organizational experience and past performance, equal in weight. Technical and management factors were given equal importance, and were to be evaluated by a technical evaluation team ("TET").

In accordance with the Evaluation Plan, each evaluator was to assess each of the proposals, identifying and documenting strengths, deficiencies, weaknesses, and areas needing clarification. Each evaluator was then to rate each area of the evaluation and give a color-rating of Blue (Exceptional), Green (Acceptable), Yellow (Marginal), or Red (Unacceptable). Then, the TET was to hold group discussions to reach a consensus on an overall color rating for each offeror.

On April 17, 2006, Southern Foods submitted a proposal for Service Area 10. USF and Sysco Corporation ("Sysco") also submitted proposals. The TET noted the following deficiencies and weaknesses in USF's technical proposal:

> DEFICIENCIES:
> - Offeror did not specify frequency of new product introduction.
>
> WEAKNESSES:
> - No additional charge for emergency orders - ONLY if it is the Offeror's fault.
> - If minimum purchase requirement for proprietary items is not met or if no proprietary items are purchased within 35 days, the items will be considered "dead inventory" and the customer will be required to purchase the remaining stock within 14 days.
> - Special orders may take three to six weeks.
> - Must request proprietary items in writing within 30 days - rigid proprietary item restrictions.

AR 1559a. For USF's management proposal, the TET noted the following deficiencies and weaknesses:

> DEFICIENCIES:
> - Did not provide % annual sales.
> - Did not provide complete HAACP plan.
> - Exception: See attachments. Pages 83 & 84 list multiple exceptions.

- Did not list proprietary items in product mix.
- Did not provide the number of drivers, pallet jacks and fork lifts.
- Did not provide number of dock doors.
- Did not provide customer satisfaction reports.
- Did not state whether equipment is owned or leased.

WEAKNESSES:
- Proposal seems rigid.
- Rigid proprietary item requirements.

AR 1559c.

With respect to Southern Foods' technical proposal, the TET found no deficiencies or weaknesses. The TET found two deficiencies in Southern Foods' management proposal:

- Did not provide number of drivers.
- Did not provide addresses of their "top 10" accounts.

AR 1559d.

The initial evaluation ratings and price evaluation for the three companies were:

* * *

AR 1694a, b. The contracting officer reviewed the findings and recommendations of the TET and evaluated the price factor by validating price analyses conducted by Mr. Naumann.

On July 5, 2006, USACFSC sent a letter to USF informing it of the deficiencies and weaknesses identified by the TET. USACFSC recommended that USF re-evaluate its proposed price margins, which the contracting officer calculated to be * * *, gross profit percentage. On July 6, 2006, USACFSC sent a letter to Southern Foods, recommending that it also re-evaluate its proposed price margins, which the contracting officer calculated to be * * *, gross profit percentage. Southern Foods submitted its first revised proposals on July 10, 2006. Sysco also submitted its proposal revisions. Rather than submitting proposal revisions, USF submitted a protest to USACFSC on July 19, 2006 challenging several clauses in the RFP.

While USACFSC was considering USF's protest, the TET evaluated the revised proposals. On August 21, 2006, the TET submitted the first proposal revisions evaluation findings to the contracting officer. The findings were:

* * *

AR 1694c.

On October 12, 2006, the contracting officer informed USF by letter that corrective action to the challenged clauses would be taken, and USF withdrew its protest on October 16, 2006. As a result, on October 26, 2006, USACFSC issued Amendment 000007 making changes to Section B of the RFP, deleting Section B-3, "Freight," and replacing Section B-7, "Calculation of Total Item Price." On November 6, 2006, USACFSC wrote to all three offerors once again requesting proposal revisions. Proposal revisions were received from USF and Sysco on November 20, 2006. USF's proposals addressed or corrected most of the deficiencies and weaknesses noted in the initial evaluation.[4/] USF and Sysco did not revise their price margins. Because Southern Foods had no deficiencies or weaknesses in its first revised proposals, it did not need to revise its technical and management proposals further. Instead, Southern Foods submitted a letter indicating it did not wish to lower its price margins.

After re-evaluation, the second revised proposal evaluation results were, as reflected in the contracting officer's D&F:

* * *

AR 1694d.

On January 24, 2007, USACFSC awarded Contract No. NAFBA1-07-D-0022 for Service Area 10 to USF. The contracting officer's D&F stated that USF's price was determined to be "fair and reasonable" and that "it is in

---

[4]On December 4, 2006, USF contacted the contracting officer and indicated that USF inadvertently had omitted certain requested information from its proposal revisions, mostly deficiencies in its management proposal relating to the number of drivers, pallet jacks and forklifts. The contracting officer accepted the information for inclusion in the contract file, but did not change USF's ratings.

[USACFSC's] best interest to award Service Area 10 to U.S. Foodservice as its overall Gross Profit Percentage is * * * and the savings are * * * for the ten-year contract period." AR 1695. The D&F further noted that a search conducted for USF in the Excluded Parties List and a Dunn and Bradstreet Report returned no negative findings.

On March 1, 2007, the contracting officer conducted a debriefing with Southern Foods. She explained that all three offerors for Service Area 10, Southern Foods, USF and Sysco, were "rated as technically acceptable with no significant weaknesses or deficiencies," and that "[w]ith equally acceptable technical proposals the award was made to the firm with the lowest evaluated price." AR 1812. On February 19, 2007, Southern Foods filed an agency protest of the contract award with the Army, and submitted an addendum to the protest on March 9, 2007. On March 27, 2007, the Army denied Southern Foods' protest. On March 30, 2007, Southern Foods filed its bid protest action with this court.

One of the arguments plaintiff raised here initially involved the second revised proposal evaluation ratings as reflected in the contracting officer's D&F. The D&F showed Southern Foods' management and overall ratings as "Green," although in the same D&F the contracting officer noted that Southern Foods did not need to revise its technical and management proposals after the first revision. Southern Foods had been rated "Blue" for its technical, management, and overall ratings after the first revised proposal evaluation, and it made no further changes to its proposals. No rationale was provided to explain this apparent change in ratings. The D&F also reflected that award to USF would result in savings of "* * * for the ten-year contract period." AR 1694e. Defendant at oral argument explained that this was an error, and instead, it should state "* * * over the [ten-year] life of the contract." Tr. at 71. The contracting officer was unavailable to testify at oral argument[5/] regarding these apparent errors in the D&F.

In view of the lack of explanation of the difference in ratings for Southern Foods and the apparent mis-statement of cost savings, rather than ruling on the motions, the court remanded the matter and ordered defendant to have a new contracting officer re-evaluate the proposals and submit a new D&F based on the proposals submitted as of November 20, 2006. The court retained jurisdiction in the interim.

---

[5]The court asked the government to attempt to have the contracting officer present at oral argument.

In the new D&F submitted to the court on May 24, 2007, the new contracting officer's re-evaluation changed USF's final overall rating from "Low Green" to "Green," explaining that dividing the color rating was unsupported and "blurs the color rating criteria." AR 1909. The final ratings for Southern Foods in the new D&F shows:

| Technical | Management | Overall |
| --- | --- | --- |
| Blue | Blue | Blue |

AR 1909. The new contracting officer also re-evaluated price proposals and calculated the total price for the ten-year period as follows:

| USF | Sysco | Southern Foods |
| --- | --- | --- |
| * * * | * * * | * * * |

AR 1910. Based on these findings, the new contracting officer confirmed the award to USF.

DISCUSSION

I. Jurisdiction

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75 (1996) ("ADRA"),[6] grants the court jurisdiction to:

> render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b). We may provide declaratory and injunctive relief as we deem proper. *Id.* § 1491(b)(2). The court may also grant monetary relief in the form of reimbursed bid preparation costs. *Id.*

The jurisdictional challenge in this case arises from the defendant's characterization of the agency involved, USACFSC, as a non-appropriated

[6]The ADRA repealed § 1491(a)(3) of the Tucker Act and replaced it with an amended § 1491(b).

fund instrumentality ("NAFI"). After stating in its motion to dismiss that the solicitation was issued by USACFSC, the government has changed position and claims that the Army Morale, Welfare, and Recreation Fund ("AMWRF") is the contracting party and that USACFSC only serves to provide guidance and oversight to AMWRF. The administrative record, however, clearly refers to USACFSC as the entity issuing the solicitation. *See, e.g.,* AR 28. Communication to offerors and to the contract awardee was made by USACFSC, or its successor, FMWRC. *See* AR 1560, 1566, 1573-75, 1696-97. The contract to USF was not only signed by USACFSC but is administered by USACFSC. *See* AR 1699. The contract at issue is for the Army's JSPV Program, which is a series of contracts between private contractors and the U.S. Army to supply food products to MWR activities. *See* AR 3-4, 28. We note, however, that the money relief of bid preparation costs plaintiff is seeking is based on its relationship as a bidder to USACFSC and not on the contract for food services itself. We, therefore, treat USACFSC as the relevant entity for NAFI consideration purposes.

"Non-appropriated fund instrumentalities (NAFIs) are federal government entities whose 'monies do not come from congressional appropriation but rather primarily from their own activities, services, and product sales.'" *El-Sheikh v. United States*, 177 F.3d 1321, 1322 (Fed. Cir. 1999) (quoting *Cosme Nieves v. Deshler*, 786 F.2d 445, 446 (1st Cir. 1986)). Both this court and the Federal Circuit have applied the general rule that the Tucker Act jurisdiction of this court is limited by the requirement that judgments awarded by this court must be paid out of appropriated funds. 28 U.S.C. § 2517; *see, eg., Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001). The result is that the court cannot hear monetary claims against NAFIs unless they fall into one of the enumerated exceptions under 28 U.S.C. § 1491(a).[7/]

---

[7]Congress amended the Tucker Act in 1970 to except military post exchanges from the applicability of the NAFI doctrine. As amended, § 1491(a)(1) now reads:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in

(continued...)

This limitation, however, would have no application to plaintiff's argument for injunctive and declaratory relief under the court's ADRA bid protest jurisdiction, as such relief would not involve the payment of monies from the Treasury.[8/] The motion to dismiss, in other words, could only impact the monetary relief sought. Plaintiff, however, in the alternative, seeks to recover its bid preparation costs, thereby triggering NAFI doctrine considerations with respect to that aspect of the complaint.[9/]

The origin of the NAFI doctrine can be traced to *Standard Oil Co. of Cal. v. Johnson*, 316 U.S. 481, 484-85 (1942), which recognized that there are certain government agencies for which the "government assumes none of the financial obligations of the exchange." *Id*. at 485. The Court of Claims interpreted *Standard Oil* to mean that the government could not be said to have consented to suit against a federal entity for which it did not assume any

---

[7](...continued)

> tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

28 U.S.C. §1491(a)(1). Though it contemplated doing so, Congress did not extend the exception to all NAFIs. *See Furash*, 252 F.3d at 1339; *McDonald's Corp. v. United States*, 926 F.2d 1126, 1129-33 (Fed. Cir. 1991).

[8]Defendant argues that, by combining a request for injunctive relief with a demand for reimbursement of bid preparation costs, the entire action, *i.e.*, the main request for equitable relief, is beyond the court's jurisdiction. Although that argument is moot in view of our ruling herein, we separately reject it. Equitable relief would not run afoul of jurisdictional limitations arising out of the NAFI doctrine.

[9]Defendant also argues that plaintiff cannot foreswear monetary relief and "manufacture jurisdiction" by avoiding the NAFI question. Def.'s Mot. to Dismiss at 14. Plaintiff is not manufacturing jurisdiction where it does not otherwise exist. The court is obliged to exercise the jurisdiction given it under the ADRA. Defendant's approach would improperly expand the NAFI exception beyond its logical application or rationale.

liability, and therefore no Tucker Act jurisdiction attached. *See, e.g., Borden v. United States*, 126 Ct. Cl. 902 (1953).

The Supreme Court, addressing the NAFI doctrine for the first time in *United States v. Hopkins*, 427 U.S. 123 (1976), defined a NAFI as a federal entity "which does not receive its monies by congressional appropriation." *Id.* at 125 n.2. This rule excluding NAFIs from the court's jurisdiction has been narrowly construed to apply when "by law, appropriated funds not only are not used to fund the agency, but could not be." *Aaron v. United States*, 27 Fed. Cl. 295, 297 (1992) (citing *United States v. Gen. Elec. Corp.*, 727 F.2d 1567, 1570 (Fed. Cir. 1984)). The doctrine does not apply if "under the agency's authorizing legislation Congress could appropriate funds if necessary." *Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331, 1334 (Fed. Cir. 2003); *Furash*, 252 F.3d at 1339 (quoting *L'Enfant Plaza Props., Inc. v. United States*, 668 F.2d 1211, 1212 (Ct. Cl. 1982)). "In other words, Tucker Act jurisdiction exists unless there is a 'firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts' of the agency." *Core Concepts,* 327 F.3d at 1334.

Drawing upon the case law, the *AINS* court established a four-factor NAFI test:

> [a] government instrumentality is a NAFI if: (1) It does "not receive its monies by congressional appropriation[]"; (2) It derives its funding "primarily from [its] own activities, services, and product sales[]"; (3) Absent a statutory amendment, there is no situation in which appropriated funds could be used to fund the federal entity[]; and (4) There is "a clear expression by Congress that the agency was to be separated from general federal revenues."

*AINS, Inc. v. United States*, 365 F.3d 1333, 1342 (Fed. Cir. 2004) (internal citations omitted). All four of these factors must be met before this court is divested of jurisdiction. *Id*. at 1342-43. Failure to meet any one factor is sufficient for this court to retain jurisdiction.

USACFSC fails to meet the first prong because sections 3-7, 3-8 and 3-9 of the Army Regulation ("Army Reg") 215-1, "Military Morale, Welfare, and Recreation Programs and Nonappropriated Fund Instrumentalities," show that all of the Army's NAFIs receive at least limited support from appropriated

funds.[10] Defendant concedes this point. However, it argues that the particular contract activity at issue here cannot receive appropriated funds. Defendant contends that "to the extent appropriated fund (APF) support can be used to support an MWR activity, it can only be for an authorized purpose." Def.'s Reply to Mot. to Dismiss at 2. Defendant points to Table D-1 of AR 215-1, which lists food supplies related to sales as activities not authorized to receive appropriated funds, to support its argument that, because the contract awarded is for food services and is not authorized to use appropriated funds, the contracting entity meets the *AINS* test. The RFP also states that "[o]nly nonappropriated funds will be used to pay for all supplies accepted under this contract." AR 72.

---

[10] Army Reg. 215-1:
3–7. Category A: Mission-sustaining programs
Considered essential to sustaining readiness, these programs generally enhance and promote the physical and mental well being of Soldiers. Programs in this category have little or no capacity for generating NAF income and are supported almost entirely with APFs.

3–8. Category B: Community support programs
These programs are closely related, in terms of supporting the military mission, to those grouped in category A. They satisfy the basic physiological and psychological needs of Soldiers and their families and provide, to the extent possible, the community support systems that make military garrisons temporary hometowns for a mobile military population. These support programs will receive substantial amounts of APF support, but differ from those programs in category A, in part because of their ability to generate NAF revenues. That ability to generate revenues is limited, however, and in no case may they be sustained without substantial APF support.

3–9. Category C: Revenue-generating programs
These programs have less impact on readiness. They offer desirable social and recreational opportunities. Programs in this category have the capability of generating enough income to cover most of their operating expenses, but they lack the ability to sustain themselves based purely on their business activity; consequently, they receive limited APF support.

The predicate of defendant's argument is that the transaction sued upon is the contract for food delivery, the subject matter of the procurement. The present suit, however, did not arise from the contract for food delivery services. That contract was not formed, at least between plaintiff and the United States, and is not, in any event, the subject of plaintiff's protest. To the extent plaintiff seeks monetary relief, it is not as a result of a breach of the contract for food delivery. Plaintiff alleges that the solicitation issued by USACFSC was not conducted properly. As we held above, plaintiff's relationship, insofar as this lawsuit is concerned, is with USACFSC.

The contracting entity is explicitly authorized to receive appropriated funds. Army Reg. 215-1, Table D-1 Funding Authorizations, 12.d.(2). Having failed to meet one of the four factors of the *AINS* test, there is no need to consider the rest of the *AINS* factors. Jurisdiction exists to grant monetary as well as injunctive relief to plaintiff.

II. Standard of Review and Standing

A. Standard of Review

28 U.S.C. §1491(b)(4) directs the court to review the legality of an agency's decision based on the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000), which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

As applied to the bid protest jurisdiction of this court, the Federal Circuit has interpreted the APA standard to mean that an agency's action may be set aside if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa*, 238 F.3d at 1332). The rational basis test involves a determination of "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332) (internal citation omitted). To prevail in a bid protest, however, a protester must still show that a significant error in the procurement process, even if it involved a violation of a procurement regulation, was prejudicial. *See id.*; *Impresa*, 238 F.3d at 1333; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996); *Data Gen. Corp. v. Johnson*, 78 F.3d

1556, 1562 (Fed. Cir. 1996). Our review of the agency's evaluation of proposals is generally limited to the administrative record. *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003).

B. Standing

Standing is a "threshold requirement in every federal action." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005). Pursuant to the ADRA, only an interested party has standing to bring a bid protest action. The Tucker Act does not define an "interested party" under the ADRA, but the Federal Circuit has held that Congress intended it to be the same "interested party" defined in the Competition in Contracting Act as "an actual . . . offeror whose direct economic interest would be affected by the award of the contract . . . ." *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)(A)). The Federal Circuit has also held that "prejudice (or injury) is a necessary element of standing." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). To prove prejudice, Southern Foods must show that it had a substantial chance of being awarded the contract but for the illegality of the contracting agency's conduct. In other words, Southern Foods' "chance of securing the award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003).

The government and intervenor challenge Southern Foods' standing, alleging that, because Southern Foods came in third in the final bidding ranking, it would not receive the award even if USF was eliminated. Defendant cites *Impresa*, 238 F.3d at 1334, to the effect that a bidder rated below second to the highest bidder does not have standing because the second highest bidder would be awarded the contract upon a new award determination. The *Impresa* court, while examining the standing issue, gave the following examples in which the Federal Circuit has found a protestor not to have a direct economic interest in the award of a contract:

> (1) a contractor that did not submit a proposal did not have an economic interest, (2) a bidder who withdrew from the procurement did not have an economic interest, or (3) a bidder rated below second lacked the required "direct economic interest in the award of the contract[.]" In those cases, the bid protester had no economic interest in the outcome since, if the protest were successful, the award would go to another party.

*Impresa*, 238 F.3d at 1334 (internal citations omitted); *see also MCI Telecomm. Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989); *Fed. Data Corp. v. United States*, 911 F.2d 699 (Fed. Cir. 1990); *Int'l Bus. Mach. Corp.*, 892 F.2d at 1010-12.

A question arises at the outset: whether we should test standing in light of the latest D&F. We think not. For reasons we explain below, we believe plaintiff had standing to bring this action, despite being ranked third, at least as the facts were known at the time of the original complaint. Those facts lead the court to remand the matter for a new determination. Even though the post-remand D&F might lead to a different prejudice analysis, we choose to limit the standing inquiry to the facts known at the time of the complaint, and will deal with the prejudice argument post-remand as part of the merits inquiry. Evaluating standing in light of the new D&F would create an intolerable ambiguity as to the court's power to have remanded the matter earlier.

In the present action, while price is significantly more important than the other two factors, technical and management, it is not the sole factor for consideration in the award decision. Also, the offerors did not differ only as to price. At the final round of evaluation, USF was rated overall "Low Green," and Sysco was rated overall "Green." AR 1694d. With respect to Southern Foods, both management and overall ratings were recorded as "Green" in the D&F. *Id*. The record, however, established that Southern Foods needed no revisions in its technical or management proposals after the first revised proposal evaluations, after which Southern Foods received "Blue" for all of its ratings. Southern Foods did not submit revised proposals after the second round of discussions. The record did not indicate any rationale for the change of ratings.

While defendant contends that Southern Foods' final ratings reflected in the D&F are the result of a clerical error, that is only a surmise. In addition, the D&F stated that the contract award to USF would result in total savings of "* * * for the ten-year contract period." AR 1694e. At oral argument, defendant explained that this, referring to the dollar difference between Sysco and USF, is another mistake and it should instead read "* * * per year," and "* * * over the life of the contract." Tr. at 71. Defendant was unable to confirm that assumption at oral argument, as the contracting officer was unavailable to testify.

Without a clear indication in the record to the contrary, however, we assume that the contracting officer meant exactly what she said in the D&F. An award was made to a bidder with a lower technical rank on a * * * contract,

based on a price difference of * * * when price was not the only factor. Given that narrow margin, the fact that the technical ratings were relevant, and arguably misunderstood, and the fact that it was not clear whether the contracting officer considered USF's late-filed material, the award constituted arbitrary conduct. Furthermore, if we were to accept the government's argument that a rating of "Low Green" was basically "acceptable," it would in effect have rendered the four-color rating scheme meaningless.

Because we could not say with certainty that the contracting officer knew what she was doing by placing Southern Foods in third place in this confused state of affairs, we believe plaintiff had standing to bring this action. Plaintiff had "more than an insubstantial chance of receiving the award." *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 515 (2007); *see also Info. Tech. & Applications*, 316 F.3d at 1319. While prejudice in the context of determining standing is obviously closely related to prejudice as it relates to the merits, for purposes of plaintiff's right to bring the action to this court, we defer any further consideration of prejudice to the merits discussion, which we evaluate in light of the latest D&F. Plaintiff had standing at the time we remanded the matter and we will not reconsider the issue.

III. Rational Basis for the Contract Award

A. Technical Acceptability of USF's Proposal

Plaintiff advances a number of arguments on the merits to the effect that the determination of the contract award did not have a rational basis or otherwise was contrary to applicable regulations. The first is that the asserted absence of customer satisfaction surveys in USF's management proposal should render it unacceptable. Under evaluation factors for "Past Performance," the RFP requires offerors to "provide customer satisfaction surveys or similar documents which attest to its performance capabilities." AR 120.

Intervenor points out that while the actual customer satisfaction surveys were not provided, customer testimonials and results of 2002 and 2003 Premier Customer Surveys were provided as "similar documents which attest to its performance capabilities." *Id.* At the initial evaluation, all three evaluators noted the absence of customer satisfaction surveys in USF's initial proposal. Two of the evaluators specifically wrote in the reports that other documents, such as "several letters of appreciation for [USF's] service," testimonials and results of 2002 and 2003 Premier Customer Surveys, were provided in lieu of actual surveys. AR 1525, 1539. The customer testimonials

as well as Premier Customer Surveys showing USF's Paducah Division received rankings within the top ten for customer satisfaction. The RFP permitted offerors to provide either actual surveys or other similar documents. USF has done so.

B. Independent Assessment of Past Performance

Plaintiff also claims that there was no independent assessment of past performance in accordance with the Acquisition Plan and the Evaluation Plan. The basis of this allegation seems to be plaintiff's belief that "independent assessments" referred to in Section L-13c of the RFP required USACFSC to contact Southern Foods' customers. AR 120. Intervenor responds, and we agree, that this allegation is without any support. The RFP did not require USACFSC to contact individual clients of each offeror as part of the evaluation.

C. Second Revised Proposal Evaluations and Remand

The new D&F shows Southern Foods' final ratings to be "Blue" for all its ratings. AR 1909. The new contracting officer, after re-evaluating the proposals, nevertheless, again determined that the contract should be awarded to USF. Making the trade-off, the new contracting officer stated in her D&F that:

> Given that Section M-2 of the RFP states price is significantly more important than technical, Southern Foods [sic] excessive margins are significantly higher in comparison to U.S. Foodservice and Sysco, and certainly the tangible benefits of a superior technical rating do not compensate for a significant price difference . . . .

AR 1912. Southern Foods' supplemental brief does not address these findings directly but merely attacks the fact that USF's proposals were submitted late. In our remand order, however, we directed the new contracting officer not to take account of USF's materials received late. The argument thus fails.

Where an evaluation is challenged, the court will "examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (internal citation omitted). Absent error or illegal conduct, "this court

will not second guess the agency's assessment of the comparative merits of proposals, a matter which is entrusted to administrative discretion in a best value procurement." *Four Points By Sheraton v. United States*, 66 Fed. Cl. 776, 784 (2005) (citing *Galen*, 369 F.3d at 1330). The new contracting officer's rationale for awarding the contract to USF is reasonable and in accordance with the criteria set forth in the RFP. She eliminated the division within color ratings, so that it is clear USF's technical and management proposals were acceptable. She made it plain that the dollar difference between USF and Sysco was * * * for the ten-year contract term.[11/] She refused to take account of USF's late-filed materials. In short, the court has no basis for quibbling with her independent judgment that, given the importance of price, the award should go to USF rather than either Sysco or Southern Foods.[12/]

D. Unequal Treatment

Plaintiff argues that the theoretical market basket that USACFSC used to evaluate price gave preferential treatment to USF. Plaintiff claims that the theoretical market basket does not accurately reflect Service Area 10. Plaintiff also insists that the theoretical market basket favors one specific category, meat products, for which USF has an advantageous margin. Plaintiff arrives at this conclusion by re-calculating the Historical Purchasing Mix for meat products using the data for the year 2005. Plaintiff further argues that the escalation of product sales over the years reflected in the theoretical market basket is "fanciful," and "over-emphasizes 'savings' from lower offered Margins." Pl.'s Cross-Mot. for J. on the AR at 21. Lastly, plaintiff contends that the theoretical market basket does not take into account differences in product quality or quantity.

---

[11]The new contracting officer was unable to verify the price calculation conducted by the previous contracting officer, and by applying the data available to her, arrived at a larger figure for the dollar differences between the three proposals.

[12]The dollar difference between USF and Southern Foods was nearly * * *. Because the court has no basis for second-guessing the contracting officer's decision in balancing price and technical factors, eliminating USF on any ground proposed by plaintiff would still leave Southern Foods in second place. Plaintiff has advanced no reason that Sysco should have been eliminated from competition. Hence, Southern Foods has shown no prejudice in so far as its argument directed at USF's proposal.

None of these arguments are supported in the record. Although plaintiff attempts to illustrate its argument by re-calculating the Historical Purchasing Mix using Service Area 10's 2005 data, plaintiff does not explain or support with the record why the Historical Purchasing Mix has to match the 2005 data. The escalation of product sales is not unreasonable, as intervenor explains, taking into account anticipated increases in the landed costs of food products due to inflation. With respect to plaintiff's argument regarding product quality and quantity differences, as intervenor explains, the market basket accounts for differences in product quality or quantity because such differences are already accounted for in the evaluation of the product's "Landed Cost." Section J, revised by Amendment 000002, required offerors to complete a "Market Basket Survey" by providing landed cost pricing with product number, item description and pack size, allowing for product quality or quantity to be taken into account. The contracting officer's price evaluation had a reasonable basis. We reject plaintiff's arguments on unequal treatment.[13/]

IV. USACFSC's Adherence to Applicable Regulation and Procedure

A. Auction

Plaintiff argues that the discussions re-opened on November 6, 2006 amounted to an illegal auction. Plaintiff cites *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 912-13 (Fed. Cir. 1988) and *Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 788 (1991), for the proposition that re-opened discussions, like re-opened public competition after cancellation of a bid, constitute illegal auctions absent a compelling reason and that there was no compelling reason here.

Defendant correctly draws a distinction between the circumstances surrounding the re-opened discussions in the present action and those in *Prineville* and *Logicon*. In *Prineville*, an oral auction was held for a sale of timber. After deciding the protesting bidder to be the highest bidder, the soliciting agency discovered an error calculating the volume of timber. The sale was cancelled and the bidder protested. The court held that there was no

---

[13] Plaintiff also attempts to assert unequal treatment by claiming that USF was given an earlier warning than Southern Foods to lower its price margins. The record indicates, however, that the contracting officer recommended that both Southern Foods and USF re-evaluate price margins at the time of the first round of discussions. The letter to USF was dated July 5, 2006, and the letter to Southern Foods was dated July 6, 2006.

reasonable basis for cancelling the sale after bidders had revealed their offers and their bidding patterns. *Prineville*, 859 F.2d at 912-13. *Logicon*, likewise, involved a situation in which, after initially determining that plaintiff was the successful offeror, the soliciting agency disclosed the amount of plaintiff's offer to the other offerors and then indicated its plan to reopen negotiations. In the present action, on the contrary, the request for final proposal revisions was made prior to contract award. Also, proposals of offerors were never revealed to competing offerors.

An "auction" is the "direct bidding of price between two competing offerors and not the negotiation of a price between an offeror and the government." *M.W. Kellogg Co./Siciliana Appalti Costruzioni S.p.A. v. United States*, 10 Cl. Ct. 17, 24 (1986). Prior to the revision of FAR Part 15[14/] in 1997, FAR Part 15.610 specifically regulated the use of certain auction techniques. That part was removed, however, during the 1997 revision. The new provision, FAR Part 15.306(e), provides that the government cannot engage in conduct that:

> (1) Favors one offeror over another;
> (2) Reveals an offeror's technical solution . . .
> (3) reveals an offerors [sic] price without that offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion. . . . .

48 C.F.R. §15.306(e) (2006). No violation of these provisions occurred here. There was no disclosure of proposals, including price, to other offerors. There was no cancelling of a contract award. No offeror was favored over another. Moreover, there was no "direct bidding of price" between the offerors and therefore no auction. *Kellogg*, 10 Cl. Ct. at 24. Rather, discussions were re-opened on November 7, 2006, after Amendment 000007, which was issued on October 26, 2006, made changes to the price terms of the RFP. We reject plaintiff's argument that there was an illegal auction.

---

[14]The FAR, or Federal Acquisition Regulation, is codified in title 48 of the Code of Federal Regulations.

B. Best Value Determination

Plaintiff's next argument is that the award violates Department of Defense Instruction 4105.71, Paragraph 6.4.1, "Nonappropriated Fund (NAF) Procurement Procedure," which requires award of nonappropriated fund contracts to those offerors that propose the best value. The basis for plaintiff's assertion is that the award in this case was made based only on the lowest price, instead of conducting a comparative assessment of the proposals in accordance with the criteria set forth in RFP and Army Regulations 215-4, ¶¶ 4-2(a) and 4-17.

Army Regulation 215-4, 4-2(a), "Best value," provides, in relevant part:

> Best value. Contracting officers can obtain best value in negotiated procurements by using any one or a combination of source selection approaches. In different types of acquisitions, the relative importance of cost or price may vary.

Army Reg. 215-4, ¶ 4-2(a). Army regulation 215-4, ¶ 4-17, "Source selection decision" provides that:

> The SSA's decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented. The documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

Army Reg. 215-4, ¶ 4-17. Defendant responds that the three rounds of evaluation for each proposal conducted by the TET met the requirements of these regulations. It argues that all of the evaluation factors set forth in the RFP were taken into account in the evaluations and documented in the administrative record.

We agree. The evaluation reports submitted by the TET to the contracting officer show that the evaluators considered and recorded their evaluation on all three factors, technical, management and price. *See* AR

1466-1551. Plaintiff does not support its broad allegation by pointing to specific records. Plaintiff also makes the more specific argument that the use of the International Merchant Purchase Authorization Card ("IMPAC") as a payment method should have been, but was not made, a requirement for the contract and therefore was not taken into consideration in the best value determination. We are unable to locate in the regulations cited by plaintiff a requirement to use IMPAC as payment method, however. Instead, Section G-4 of the RFP states:

> Payment made by Government-wide commercial credit card, i.e., International Merchant Purchase Authorization Card ("I.M.P.A.C.") is authorized. The Contractor may accept the I.M.P.A.C. as a method of payment for products delivered under this contract.

AR 72 (emphasis in original). Thus, the use of IMPAC is permitted, not required.

Plaintiff draws the court's attention to the fact that participation in the Joint Service Prime Vendor Program becomes mandatory in all installations as of May 1, 2007. We are unable to find any relevance of this to the contract or the alleged requirement of using the IMPAC payment method. To the extent these are attacks on the terms of the RFP, plaintiff had the chance to protest before the award of the contract. Not having contested these points before the award of the contract, plaintiff cannot now request that the terms of the RFP be modified. *See Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 513-14 (2006).

Plaintiff also claims, without any supporting material, that there are reports of complaints about the food service USF has begun to provide in Service Area 10. To this, the intervenor correctly responds that this is a post-award issue and must be rejected. This appears to be a mere attempt on the part of plaintiff to claim the superiority of its services. We do not view this as a valid argument, and, in any event, plaintiff does not have standing to critique intervenor's post-award performance.

C. Responsibility Determination

Plaintiff asserts in its complaint that the award violates Army Regulation 215-4, ¶ 2.7(b) because the responsibility determination consisted of merely "vetting" USF against the Excluded Parties List System. Compl. ¶ 3. We disagree.

The FAR provides that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b) (2006). In making a determination of responsibility, a contracting officer in general has wide discretion both in making a determination of responsibility and in determining the amount of information required to make the determination. *Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002); *Impresa*, 238 F.3d at 1334-35; *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed.Cir.1999). While a contracting officer is required to explain a determination of nonresponsibility, the FAR does not require an explanation that the offeror is responsible. 48 C.F.R. § 9.105-2(b); *Impresa*, 238 F.3d at 1334. The burden is on the disappointed offeror to establish that the contracting officer acted arbitrarily and capriciously. *See* 5 U.S.C. § 706; *Impresa*, 238 F.*3d* at 1337. The agency is entitled to a presumption of regularity. Only if the challenger presents evidence suggesting arbitrary and capricious action rebutting the presumption of regularity, may the court require the agency to provide an explanation for its determination. *Impresa*, 238 F.3d at 1338.

Here, plaintiff has not met its burden to establish any arbitrary and capricious action on the part of the contracting officer. Plaintiff merely states that the determination consisted solely of searching for USF in the Excluded Parties List. In fact, the contracting officer noted in her D&F that she also obtained a Dunn and Bradstreet Report for USF to verify its business credit information. AR 1694e. Plaintiff appears to attempt to draw an inference that USF is not responsible based on some prior criminal investigations into a former employee of USF. This alone, without more, does not establish arbitrary and capricious conduct on the part of the contracting officer. We see no basis to reverse the contracting officer's determination.

## CONCLUSION

For the reasons set out above, we deny defendant's motion to dismiss for lack of jurisdiction, grant defendant's motion for judgment on the administrative record and deny plaintiff's motion for judgment on the administrative record. Plaintiff's motion to supplement the administrative record is denied. The Clerk is directed to dismiss the complaint. No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge